UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| EARLENE DODSON-WALKER, )<br>   Plaintiff, )<br>          )<br> vs.         )<br>           )<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF SOCIAL SECURITY, )<br>   Defendant. ) | 1:07-cv-0699-LJM-JMS |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Earlene Dodson-Walker ("Dodson-Walker"), requests judicial review of a final decision of Defendant, Michael J. Astrue, Commissioner of the Social Security Administration (the "Commissioner"), which found that she was not entitled to Disability Insurance Benefits ("DIB"). The Court rules as follows.

## I. BACKGROUND

Dodson-Walker was born on April 22, 1961. R. at 13. She was forty-two years old on her alleged onset date, January 23, 2004. R. at 22. Dodson-Walker appeared and testified at a hearing held on September 6, 2006, before Administrative Law Judge, James R. Norris ("the ALJ"). R. at 13, 23. The ALJ issued his decision on November 7, 2006. R. at 23. Dodson-Walker was forty-five years old on the date of the ALJ's decision. R. at 23. She completed eleventh grade and has prior work experience as a nurse's aide. R. at 82, 86, 218.

Prior to her alleged onset date, on December 11, 2003, Kenneth L. Renkens, Jr., M.D. ("Dr. Renkens"), referred Dodson-Walker to William H. Cooper, M.D. ("Dr. Cooper"), a neurologist, for

persistent pain in her neck, shoulder and arm, with an abnormal MRI. R. at 109, 151. At the referral appointment, Dodson-Walker reported to Dr. Cooper that she had undergone a laminectomy two years earlier when she presented with radicular-type symptoms. R. at 109. During that surgery she was found to have an Arnold Chiari malformation.[1] *Id.* Although Dodson-Walker did experience some relief from the surgery, in the period following it she began to have recurrent problems with pain that involved her left chest wall, axilla, arm, and shoulder. *Id.* The pain radiated from her arm to her waist. *Id.* Associated with this pain she experienced "extreme burning and aching" to the point where it was difficult for her to sleep or function. *Id.* At this appointment she stated that she had recently begun to have pain radiating into her ear, and she told the doctor that an MRI that she had a month before showed a syrinx.[2] *Id.* Dr. Cooper noted that on exam Dodson-Walker had more difficulty testing her left upper extremity than all of her other extremities and further that she did appear to have weakness in her left tricep. R. at 158. However, Dr. Cooper stated that Dodson-Walker did not seem to have any symptoms on the right. R. at 109.

At the end of the appointment Dr. Cooper indicated that Dodson-Walker needed to have an electromyograph ("EMG") and nerve conduction study done on her left arm to see how acute the changes were. R. at 110. He prescribed a Duragesic patch for her pain with a Norco prescription for rescue. *Id.* He also stopped her Neurontin and switched her to Topamax. *Id.*

On December 16, 2003, Dodson-Walker had an EMG and nerve conduction study on her left

---

[1] An Arnold Chiari malformation is a "developmental anomaly at the base of the brain which results in the downward displacement of some of the brain's structures into the spinal canal." R. at 183.

[2] A syrinx is a fluid filled cyst that occurs on the spinal cord and is produced by a condition called syringomyelia, which often appears in conjunction with an Arnold Chiari malformation. R. at 183.

2

arm to examine the effects of possible syringomyelia and persistent pain in her left arm. R. at 147. The results of both tests were unremarkable. R. at 152.

On January 6, 2004, Dodson-Walker had a follow up appointment with Dr. Cooper. *Id.* During that appointment she told Dr. Cooper that the Duragesic patch had helped ease her symptoms, and that she no longer needed to take a lot of the Norco. *Id.* She also told Dr. Cooper that she was worried about work because it required her to do a lot of lifting, and the lifting tended to aggravate the pain. *Id.* At the appointment, Dr. Cooper decided that Dodson-Walker should stay on the Duragesic patch, and he agreed that work might be a problem; Dr. Cooper wrote her a note in which he requested that she be required to lift no more than ten pounds. *Id.*

On January 23, 2004, Dr. Cooper wrote a note on a prescription pad that said that due to the level of physical exertion that accompanied her position, Dodson-Walker was to be put on medical leave. R. at 175.

Six days later, Dodson-Walker saw Dr. Cooper for a follow up for persistent pain in her arm, neck and chest wall. R. at 165. Dr. Cooper speculated that it was likely due to her posterior syrinx and Arnold Chairi malformation. *Id.* Dr. Cooper noted that Dodson-Walker seemed to be doing better than she was at her initial exam with him. *Id.* He noted that she had been on light duty at work, but that her employer had difficulty finding that type of work for her. *Id.* He determined that physical labor would likely just aggravate Dodson-Walker's symptoms and decided that it would be best to continue to treat her symptomatically; therefore, he renewed her pain medicines. *Id.*

On March 31, 2004, Dr. Cooper saw Dodson-Walker again and noted that she was doing better on the Duragesic patch, but she did have to supplement it occasionally with Hydrocodone. R. at 150. At that appointment, she complained of general fatigue and had decreased exercise

tolerance. *Id.* Further, he noted that she was concerned about work because of her inability to lift. *Id.* Upon exam, Dodson-Walker's gait was slow but unremarkable, and she had brisk reflexes bilaterally except in her left tricep. *Id.* Dr. Cooper decided to give Dodson-Walker a Lexapro prescription for mild depression, and he increased her Duragesic dosage. *Id.* Additionally, he noted that he spoke with her briefly about applying for disability, and he said that he told her he had no objection if she really could not continue to do the physical maneuvers required at her job. *Id.*

On May 11, 2004, Dodson-Walker saw Dr. Cooper and she reported that her increased dose of Duragesic helped her pain, but she also reported increased drowsiness and some swelling around her neck and shoulder. R. at 229. On exam Dodson-Walker's motor skills were five out of five, but Dr. Cooper did note some "give-way" weakness on her left side, particularly at the tricep. *Id.* At her request, Dr. Cooper decreased her dosage of Duragesic and, instead, prescribed Darvocet to supplement. *Id.*

On September 2, 2004, Dodson-Walker exhibited some "give-away" weakness on her left side. R. at 227. Two months later on November 2, 2004, Dr. Cooper noted that overall Dodson-Walker seemed to be doing much better. R. at 223.

On June 23, 2005, Dodson-Walker had a MRI which showed a "very small central spinal cord syrinx." R. at 201. The reviewing physician said that it appeared to be "markedly improved" from the prior MRI. He also noted a small postoperative fluid collection adjacent to the craniectomy, but that the remaining spinal cord was in a normal position, signal and caliber. *Id.* At C5-6 he found mild circumferential disc bulge as well as mild facet and uncovertebral spurring. *Id.* He also found a slight disc bulge and spurring at C6-7. *Id.*

In November 2005, Dr. Cooper filled out a residual functional capacity ("RFC")

4

questionnaire in which he stated that Dodson-Walker could sit for two hours at one time, and that she could stand for one hour at a time. R. at 212. Dr. Cooper also said that in an eight-hour work day Dodson-Walker would be able to stand about two hours total, and that she would need to have periods where she could walk around at least every thirty minutes. R. at 213. Dr. Cooper also indicated that Dodson-Walker was limited in her ability to use both her right and left arms. R. at 214. He opined that she could, with either hand, grasp for 10% of the work day, perform fine manipulation tasks for 25% of the workday and reach (including overhead) for 10% of the workday. *Id.*

In a neurologic progress note on March 3, 2006, Dr. Cooper stated that Dodson-Walker reported progressive numbness in her left thumb as well as increasing pain across the upper part of her back. R. at 231. He noted that her motor exam was five out of five bilaterally and that Dodson-Walker exhibited a bit of "give-away" weakness. *Id.* He also noted that her reflexes were brisk, she had no definite pathologic reflexes, and that her gait was slow but unremarkable. *Id.*

At Dodson-Walker's hearing Karl Manders, M.D. ("Dr. Manders"), testified that Dodson-Walker's syrinx was residual. R. at 241. When the ALJ asked him if based on medical evidence the syrinx was causing Dodson-Walker any pain, Dr. Manders responded that pain was subjective, but that Dodson-Walker was on pain medication. R. at 244. He also said that Dodson-Walker did not display the reflexes that would indicate that the syrinx was causing any compression on her spinal cord. *Id.* Dr. Manders also testified that, in his assessment, Dodson-Walker could do light work. R. at 248. He admitted that pain was commonly associated with Dodson-Walker's condition, but that it was subjective. R. at 249.

## II. DISABILITY AND STANDARD OF REVIEW

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

1. If the claimant is employed in substantial gainful activity, the claimant is not disabled.

2. If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

3. If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

4. If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

5. If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. §405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See, e.g.*, *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by

6

substantial evidence. 42 U.S.C. § 405(g); *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Id.* While a scintilla of evidence is insufficient to support the ALJ's findings, the only evidence required is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### III. DISCUSSION

#### A. THE ALJ'S FINDINGS

Before undertaking the sequential evaluation, the ALJ found that Dodson-Walker's insured status had not expired. R. at 15. At the first step of the analysis the ALJ found that Dodson-Walker had not engaged in substantial gainful activity since January 23, 2004, the alleged onset date. R. at 15. At the second step the ALJ found that both Dodson-Walker's degenerative disc disease and her syringomyelia were severe impairments, but the ALJ found that her depression was not. R. at 15-16. At step three the ALJ determined that neither Dodson-Walker's degenerative disc disease nor her syringomyelia met or were medically equal to the listed impairments. R. at 16-17. The ALJ then determined that Dodson-Walker could perform a full range of light work. R. at 17-22. At step four the ALJ determined that Dodson-Walker would be unable to perform her past relevant work as a nurse aid because it required her to lift over one-hundred pounds occasionally, and fifty pounds frequently. R. at 22. However, at step five, the ALJ determined that given Dodson-Walker's age, education, work experience, and ability to perform a full range of light work, there existed a

significant number of jobs in the national economy that she could perform. R. at 23. Thus, the ALJ determined that Dodson-Walker was not disabled. *Id.*

### B. THE ALJ'S APPLICATION OF THE "SUBSTANTIAL EVIDENCE" STANDARD

Dodson-Walker first argues that the ALJ applied the wrong standard of proof when he adjudicated the initial claim of disability. Although the Social Security Act and the regulations under it do not prescribe the standard of proof for disability actions, the Seventh Circuit has stated that a preponderance of the evidence is the proper standard as it is the default in administrative hearings. *Jones ex rel. Jones v. Chater*, 101 F.3d 509, 512 (7th Cir. 1996) (citing *SEC v. Steadman*, 450 U.S. 91, 101 n.21 (1981)). However, there is one exception to this standard burden of proof. The test for determining whether "controlling weight" is owed to a treating source's opinion involves an assessment of "substantial evidence." 20 C.F.R. § 404.1527(d)(2). Dodson-Walker points to eight instances where the ALJ referred to "substantial evidence" in his decision, and Dodson-Walker claims that six of those times the ALJ relied on the "substantial evidence" standard improperly.[3] R. at 16, 17, 19, 20, 21. Therefore, according to Dodson-Walker, the ALJ fundamentally misunderstood the burden of persuasion, and as a result, his decision should be reversed and remanded.

Dodson-Walker also argues that the deferential substantial-evidence standard of review does not insulate the ALJ's decision from reversal. In support of this proposition, Dodson-Walker cites *Charlton v. FTC*, 543 F.2d 903, 907 (D.C. Cir. 1976).

---

[3] The ALJ referred to "substantial evidence" properly when he discussed whether Dr. Cooper's opinions should be given controlling weight. 20 CFR § 404.1527(d)(2); R. at 20-21.

The Commissioner argues that even if the ALJ erred by applying the wrong standard of proof, the error was harmless because the ALJ only misused the standard when he discussed the first four steps of the sequential review. In those steps Dodson-Walker had the burden to prove that she was disabled, *Brown v. Yuckert*, 482 U.S. 137, 146 n.5 (1987), and the "substantial evidence" standard on which the ALJ relied is less burdensome than "preponderance of the evidence." *Young*, 957 F.2d at 389. Thus, the ALJ erred in favor of Dodson-Walker.

The Court cannot agree with Dodson-Walker's analysis. *Charlton* is different than the case before this Court because in *Charlton* the error was prejudicial to the plaintiff, whereas in this case Dodson-Walker benefits by any error that the ALJ may have made. *Charlton*, 543 F.2d at 908. The Seventh Circuit has routinely allowed the use of the doctrine of harmless error in social security cases. *See, e.g.*, *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) ("the doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions"); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (same). Thus, any error on the part of the ALJ in applying a lower standard of proof to issues upon which Dodson-Walker bore the burden of proof is in her favor and is not grounds to remand his decision.

### C. THE ALJ'S CONSIDERATION OF DODSON-WALKER'S LEFT ARM

Dodson-Walker next argues that the ALJ's decision was internally inconsistent with respect to her ability to use her left arm, and because of that inconsistency the decision must be remanded. *See Paterson v. Chater*, 96 F.3d 1015, 1016 (7th Cir. 1996). Dodson-Walker asserts that the ALJ's inconsistency lies in the fact that although that the ALJ accepted that the restrictions that Dr. Cooper placed on Dodson-Walker's use of her left arm in his RFC questionnaire were supported by medical

evidence, the ALJ did not acknowledge Dodson-Walker's left arm limitations in his RFC assessment.

The Court cannot agree because Dodson-Walker overstates what the ALJ noted in his decision. The ALJ stated:

> However, Dr. Cooper's opinion is internally inconsistent. He reports [Dodson-Walker] can sit for two hours at one time, but then states that she must have periods of walking every thirty minutes. In addition, Dr. Cooper imposes the same significant limitations of reaching, and fine and gross motor movements on [Dodson-Walker's] left and right arms, despite his own treatment records reporting that [Dodson-Walker] has no symptoms on her right side.

R. at 21. Taken in context, this statement evidences that Dr. Cooper's opinion is not internally consistent, and thus, should not be given controlling weight. *See Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a treating physician's medical opinion . . . when the treating physician's opinion is internally inconsistent as long as he minimally articulates his reasons for crediting or rejecting evidence of disability"). In fact, the ALJ states that in December 2003 "[Dodson-Walker's] motor exam was five out of five in her lower extremities and right upper extremity . . . [although], she did have some weakness in her left tricep." R. at 18. He goes on to note, however, that her MRI in June of 2005 showed that her syrinx was residual and stable, which implied that Dodson-Walker's reported symptoms were disproportionate to the size of the abnormality. *Id.* Further, Dodson-Walker had EMG studies completed on her left arm and they all resulted in unremarkable findings. The ALJ never acknowledged that the non-exertional limitations that Dr. Cooper placed on Dodson-Walker's left arm were supported by the medical record. Instead, he addressed the objective medical evidence and found that it failed to support Dr. Cooper's specific

non-exertional limitations on Dodson-Walker's left arm. Thus, there is no inconsistency in the ALJ's decision and, as such, this theory provides no grounds for remand.

### D. THE ALJ'S TREATMENT OF DR. MANDERS' TESTIMONY

Dodson-Walker also argues that Dr. Manders' testimony at the hearing could not constitute substantial evidence for the ALJ's RFC finding. Dodson-Walker points out that at the hearing Dr. Manders agreed that Dodson-Walker could perform light work, but on cross examination he admitted that he did not take Dodson-Walker's reported pain into account when he assessed her RFC. Thus, according to Dodson-Walker, "because Dr. Manders did not address the critical issue as to the support for Dodson-Walker's statements about her symptoms, his testimony was simply not germane to the determination of Dodson-Walker's [RFC]." Pl. Br. at 13. In support of this proposition Dodson-Walker relies on *Wilder v. Apfel*, 153 F.3d 799 (7th Cir. 1998). However, that case differs from the instant case because in *Wilder* the medical expert offered gratuitous legal judgments not based on the medical evidence that the ALJ then relied upon, which is clearly in error. *See id.* at 802.

The ALJ in the case at bar relied on Dr. Manders' testimony primarily for his judgments regarding the objective medical evidence. *See* R. at 18 (noting that Dr. Manders considered the small size of the syrinx to be significant); R. at 22 (noting that Dr. Manders examined Dr. Coopers' treatment notes and found no objective medical evidence to support the reported increase in Dodson-Walker's symptoms). Dr. Manders never made legal conclusions like those of the medical expert in *Wilder*. *Compare Wilder*, 153 F.3d at 801-02 (noting that the medical expert made a legal judgment by testifying that even though he believed reports of depression were accurate, they were

irrelevant because they were not supported by contemporaneous medical documentation), *and* Dr. Manders' test., R. at 241-50 (stating that pain is subjective and the only thing that he could base his judgments on was the objective medical evidence in the record that indicated that she was stable and that she took medication for pain). Dr. Manders simply made statements regarding the objective medical evidence in the record, and the ALJ drew his own legal conclusions from that testimony as well as the internal inconsistencies in Dr. Cooper's opinion. The ALJ also noted that Dr. Renkens, Dodson-Walker's original neurosurgeon, limited to her to only light-duty work. R. at 21. Thus, Dr. Manders' testimony is not the only evidence the ALJ considered.

The Court concludes that, although Dr. Manders' testimony is not conclusive on the issue of Dodson-Walker's RFC assessment, it is evidence that the ALJ was entitled to consider, and in fact, it was evidence he was required to consider. 20 C.F.R. § 404.1527(f); *see also* SSR 96-6p. It was not, as Dodson-Walker suggests, "simply not germane to the determination of Dodson-Walker's [RFC]."

### E. THE ALJ'S TREATMENT OF DR. COOPER'S OPINIONS

Dodson-Walker also argues that the ALJ erroneously rejected Dr. Cooper's opinions because the ALJ made statements in his decision that suggested that Dr. Cooper's opinion had no element of medical findings, and she asserts that the regulations require the ALJ to re-contact Dr. Cooper to clarify his opinion. 20 C.F.R. § 404.1512(e). However, the ALJ based his evaluation of Dr. Cooper's opinion primarily on the internal inconsistencies in Dr. Cooper's November RFC questionnaire. R. at 21 (noting that on the questionnaire Dr. Cooper states that Dodson-Walker can sit for two hours at one time but then that she needs to walk every thirty minutes, and that although

Dr. Cooper noted in his exam records specifically that Dodson-Walker had no right-side symptoms, he heavily limited her right side use). Those inconsistencies gave the ALJ an adequate reason for giving Dr. Cooper's opinion less weight. *Skarbek*, 390 F.3d at 503. The evidence before the ALJ was not unclear or inadequate, and thus, he acted within his discretion when he decided not to re-contact Dr. Cooper. *See* 20 C.F.R. § 404.1527(f)(2)(iii); *Skarbek*, 390 F.3d at 504.

Dodson-Walker further claims that the ALJ impermissibly "played doctor" when he noted that Dr. Cooper's characterization of Dodson-Walker's condition as inoperable due to its size and condition was inaccurate. Dodson-Walker accurately states that an ALJ may not "play doctor" by substituting his or her own judgment for that of a physician without relying upon other medical evidence or authority in the record. *See, e.g.*, *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000). However, the ALJ in the case at bar relied on other medical evidence in the record when he questioned Dr. Cooper. He relied on Dr. Renkens' notes and opinion, and he also relied on Dr. Manders' characterization of Dodson-Walker's syrinx. R. at 21. Thus, Dodson-Walker's claim that the ALJ played doctor is inaccurate.

Dodson-Walker argues that if the ALJ correctly evaluated Dr. Cooper's opinions he failed to consider whether she was disabled during the closed twelve-month period between January 23, 2004, and June 2005. Dodson-Walker states that the ALJ's statement that her syrinx improved significantly from March 2002 to June 2005 indicates that he should have considered a closed period of disability from her alleged onset date to the time of the improvement. 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509. However, the ALJ considered the entire time period including that before her improvement, and at no time did he consider her to be unable to work. In fact, he noted that the medical leave Dr. Cooper placed Dodson-Walker on in January 2004 was based on her employer's

13

inability to accommodate a "light duty" restriction, which implies that at that point she was still capable of light duty and not disabled. Thus, a closed period of disability would not help Dodson-Walker.

### F. THE ALJ'S EVALUATION OF THE SIDE EFFECTS OF DODSON-WALKER'S MEDICATIONS

Dodson-Walker argues that it is error that the ALJ did not account for Dodson-Walker's drowsiness in his RFC assessment even though he acknowledged that drowsiness was a side effect of her medication. Thus, according to Dodson-Walker, the ALJ's decision was internally inconsistent, and that is grounds for remand. The Commissioner argues that the ALJ is not required to make express findings regarding the side effects of medication. *See Nelson v. Sec'y of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985); *Herron v. Shalala*, 19 F.3d 329, 335-36 (7th Cir. 1994).

The ALJ made specific statements regarding the side effects of Dodson-Walker's medication. He stated in his decision:

> Turning to the side effects of the medications, [Dodson-Walker] reports drowsiness, constipation, and upset stomach. However, Dr. Cooper indicated drowsiness as the claimant's only side effect . . . . Evaluating the impact of the alleged side effects of the claimant's medications is problematic. It is clear from the record that the (unspecified) medication(s) are not shown in the medical evidence to have a twelve month totally debilitating effect on the claimant's ability to function, although the claimant alleges to the contrary. The claimant has a history of taking strong pain medication and it is not surprising that some drowsiness would be present on occasion.

R. at 19.

Although it is true that the ALJ need not make specific findings, in the instant case that is not the issue. The issue is whether the ALJ failed to consider the drowsiness that he acknowledged when

he made his the RFC assessment. Medications need not have a "totally debilitating" effect on Dodson-Walker to be accounted for in the ALJ's RFC assessment. Although the medication alone might not be enough to prevent her from working, the ALJ was required to consider the aggregate effect of Dodson-Walker's impairments when determining her RFC. 42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 404.1523 (2007); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). In fact, the regulations guarantee that secondary effects and symptoms related to the objective medical evidence will be taken into consideration when determining a claimant's RFC.

> Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone we will carefully consider any other information you may submit about your symptoms . . . because symptoms, such as pain, are subjective and difficult to quantify any symptom related functional limitation and restrictions which you, your treating or non-treating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account.

20 C.F.R. § 404.1529(c)(3); *see also* 20 C.F.R. § 404.1529(c)(4).

Thus, the ALJ needed to evaluate whether Dodson-Walker's drowsiness in combination with her other ailments, would impact her ability to perform "sustained" work on a "regular and continuing basis."[4] The ALJ's discussion of Dodson-Walker's drowsiness implies that it is not totally debilitating but goes no further. As a result, the Court does not have sufficient information to determine whether the ALJ considered it in combination with Dodson-Walker's other ailments in making his RFC assessment. Thus, the Court cannot "track the ALJ's reasoning and be assured that the ALJ considered the important evidence." *Diaz*, 55 F.3d at 308 (quoting *Green v. Shalala*,

---

[4]SSR 96-8p states that a "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A regular and continuing basis means eight hours a day, for five days a week, or an equivalent work schedule."

51 F.3d 96, 101 (7th Cir. 1995)).  For this reason alone, the ALJ's decision must be **REMANDED** for further consideration.

## IV. CONCLUSION

For the reasons stated herein, the cause is **REMANDED** for further proceedings consistent with this opinion.

IT IS SO ORDERED this 26th day of June, 2008.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

J. Frank Hanley II
lawoffices@jfrankhanley.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov